## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **DANIEL COLLINS**<br>4303 La Plata Avenue<br>Baltimore, MD  21211<br><br>and<br><br>**ATHENA SARATSIOTIS COLLINS**<br>4303 La Plata Avenue<br>Baltimore, MD  21211<br><br>and<br><br>**ATHENA SARATSIOTIS COLLINS,**<br>**PERSONAL REPRESENTATIVE**<br>**OF THE ESTATE OF**<br>**EVONNE SARATSIOTIS, DECEASED**<br>4303 La Plata Avenue<br>Baltimore, MD  21211<br><br>*Plaintiffs*<br><br>v.<br><br>**AMAZON.COM SERVICES INC.**<br>410 Terry Avenue North<br>Seattle, Washington 98109<br><br>Serve On:   CSC-Lawyers<br>Incorporating Service Co.<br>7 St. Paul Street<br>Suite 820<br>Baltimore, MD 21202<br><br>and<br><br>**TAIYUAN GONGSHOU**<br>**DIANZISHANGWU FUWU**<br>**YOUXIANGONGSI, a foreign**<br>**international entity,**<br>**D/B/A AUTO LIVING**<br>dongtian 2xiang 3# 3F<br>outu gongsi zhongchuang kongjian No.47<br>Zonggai shifanqu taiyuan xuefu yuanqu<br>Shanxi 030032, China | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No.:_____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

and                                            )
                                               )
**SHENZHEN DIKA NA'ER**                        )
**E-COMMERCE CO., LTD.**                        )
**a foreign international entity**              )
**D/B/A SUAOKI**                                )
Room 1907-38-85,                               )
Guangyin Building, No. 38                      )
Futian South Road, Futian District             )
Shenzhen                                       )
China  518000                                  )
                                               )
and                                            )
                                               )
**SHENZHEN GLOBAL EGROW**                       )
**E-COMMERCE CO., LTD**,                         )
**a foreign international entity**              )
**D/B/A SUAOKI**                                )
201,2 F, Blk 8, Zhongxing Industrial Town   )
Chuangye Rd, Nanshan Dist                      )
Shenzhen, Guangdong                            )
China                                          )
                                               )
and                                            )
                                               )
**SHENZHEN KAYO MAXTAR**                        )
**BATTERY LIMITED,**                            )
**a foreign international entity,**             )
**D/B/A MAXTAR GROUP**                          )
Shenzhen Shiyan Street                         )
Germany and China Road                         )
Thai Information Technology Industrial Park)
Block A, Building 11-13, West Wing             )
Shenzhen                                       )
China                                          )
                                               )
and                                            )
                                               )
**SHENZHEN POWEROAK NEWENER**  )
**CO., LTD., a subsidiary of Maxtar Group**)
Room 701-703, Block B,                         )
KaiDaEr Building, No. 168                      )
Tong Sha Road                                  )
Xili Town, NanShan District                    )
Shenzhen                                       )
China                                          )
                                               )

and                                              )
                                                 )
**DOEs 1 -100, inclusive, and**                  )
**DOE BUSINESS ENTITIES 1-100,**                 )
                                                 )
_____*Defendants*_____)

## COMPLAINT

Plaintiffs, Daniel Collins, Athena Saratsiotis Collins, individually and as husband and wife, and Athena Saratsiotis Collins, Personal Representative of Evonne Saratsiotis, Deceased (collectively "Plaintiffs"), by their undersigned attorneys BOWIE & JENSEN, LLC, file this Complaint against Amazon.com Services, Inc.; Taiyuan Gongshou Dianzishangwu Fuwu Youxiangongsi, d/b/a Auto Living; Shenzhen Dika Na'er E-Commerce Co., Ltd., d/b/a Suaoki; Shenzhen Global Egrow E-Commerce, Ltd., d/b/a Suaoki; Shenzhen Kayo Maxtar Battery Limited, d/b/a Maxtar Group; Shenzhen Poweroak Newener Co., Ltd., a subsidiary of Maxtar**;** and DOEs 1-100 and DOE Business Entities 1-100  (collectively, the "Defendants").  In support, Plaintiffs state as follows:

## INTRODUCTION

1.     This is an action resulting from injuries and damages sustained in a catastrophic house fire on March 11, 2018 at 902 Crestwick Road, Towson, Maryland 21286, the Plaintiffs' former residence ("Residence") that was caused by a defective Suaoki brand generator sold by Defendant Amazon.com Services, Inc. and manufactured, designed, distributed, and marketed/sold by the co-Defendants.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      This Court has personal jurisdiction over the parties, as the Plaintiffs are residents of Maryland and Defendants manufacture and/or offer products for sale in Maryland. Upon information and belief, each of the Defendants:

- transacts business and/or performs work or services in the State of Maryland;

- contracts to supply goods, services and/or manufactured products in the State;

- has caused tortious injury in the State by acts or omissions in the State; and/or

- has caused tortious injury in the State by acts or omissions outside the State and regularly does or solicits business or derives substantial revenue from goods, services and/or manufactured products used or consumed in the State.

4.      Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in this district and a substantial part of the property that is the subject of this action is situated in this district.

## THE PARTIES

5.      Plaintiff Daniel Collins is a resident of Baltimore City, Maryland and resides at 4303 La Plata Avenue, Baltimore, Maryland 21211.

6.       Plaintiff Athena Saratiotis Collins is a resident of Baltimore City, Maryland and resides at 4303 La Plata Avenue, Baltimore, Maryland 21211.

7.       Plaintiffs Daniel Collins and Athena Saratiotis Collins are married to one another and at all times relevant to the subject matter of this Complaint have been and continue to be husband and wife.

8.      Evonne Saratiotis, the mother of Plaintiff Athena Saratiotis Collins and mother-in-law of Plaintiff Daniel Collins, who was ninety-one (91) years old and a resident of Baltimore County, Maryland on March 11, 2018, was living in the Residence with Plaintiffs that had been set up for at-home care, complete with medical and caregiving accommodations for Evonne.

-4-

9.      Evonne Saratiotis died within four (4) months of the March 11, 2018 fire as a result of injuries she sustained in the fire.

10.      Plaintiff Athena Saratiotis Collins, a resident of Baltimore City Maryland residing at 4303 LaPlata Avenue, Baltimore, Maryland 21211, was appointed as the Personal Representative of the Estate of Evonne Saratiotis by Letters of Administration granted by the Register of Wills for Baltimore County, Maryland on January 23, 2020 in Estate No. 206981.

11.      Defendant Amazon.com Services, Inc. ("Amazon") is a corporation organized and existing under the laws of the Delaware, with its principal place of business in Seattle, Washington, which routinely does business in, and receives economic benefit from, the sale of products to retail consumers in the State of Maryland.

12.      Defendant Taiyuan Gongshou Dianzishangwu Fuwu Youxiangongsi, d/b/a Auto Living ("Auto Living"), is a company organized and existing in the People's Republic of China, with its principal place of business located in Shanxi, China, which routinely does business in, and receives economic benefit from the sale of products to retail customers in the State of Maryland.

13.      Defendant Shenzhen Dika Na'er E-Commerce Co., Ltd., d/b/a Suaoki ("Suaoki"), is a company organized and existing in the Guangdong Province of China, with its principal place of business located in Shenzhen, China, which routinely does business in, and receives economic benefit from the sale of products to retail customers in the State of Maryland.

14.      Defendant Shenzhen Global Egrow E-Commerce Co., Ltd, d/b/a Suaoki ("Global Egrow Suaoki"), is a company organized and existing in the Guangdong Province of China, with its principal place of business located in Shenzhen, China, which routinely does business in, and receives economic benefit from the sale of products to retail customers in the State of Maryland.

15.      Defendant Kayo Maxtar Battery Limited, d/b/a Maxtar or Maxtar Group ("Maxtar") is a company organized and existing in the Guangdong Province of China, with its

principal place of business located in Shenzhen, China, which is in the business of manufacturing, selling and shipping rechargeable lithium-ion batteries and routinely does business in, and receives economic benefit from the sale of products to retail customers in the State of Maryland.

16.     Defendant Shenzhen Poweroak Newener Co., Ltd., d/b/a PowerOak ("PowerOak"), a subsidiary of Defendant Maxtar, is a company organized and existing in the Guangdong Province of China, with its principal place of business located in Shenzhen, China, which is in the business of manufacturing, selling and shipping rechargeable lithium ion batteries and all-in-one solar energy storage system, and routinely does business in, and receives economic benefit from the sale of products to retail customers in the State of Maryland.

17.     Defendant DOEs 1-100 and DOE Business Entities 1-100 ("DOEs") are persons, individuals, partnerships, corporations and/or associations subject to suit in a common name whose true identities are unknown and who may be responsible in whole or in part, for the events and happenings referred to herein and legally caused the damages alleged by Plaintiffs in this Complaint.  Plaintiffs will seek to amend this Complaint to set forth the true names and capacities of any of the DOE Defendants when their identities become known.

**FACTS**

18.     Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 17 as if fully set forth herein.

19.     At all times relevant including on March 3, 2018, Defendant Amazon operated a website commonly known as "Amazon.com" ("Amazon's website") selling products to consumers in the State of Maryland.

20.     On March 3, 2018, Daniel Collins purchased the Suaoki Generator manufactured by Defendants Suaoki from Amazon's website and accepted delivery shortly thereafter.

21.     On March 11, 2018, the Suaoki Generator was inside Plaintiffs' Residence.

22.     At approximately 5:45 a.m. on March 11, 2018, Plaintiff Athena Collins, in keeping with the product instructions, had plugged the Suaoki Generator into the wall outlet in the family room on the first floor at the rear of the Residence to charge it for the first time.

23.     At approximately 7:45 a.m. on March 11, 2018, Plaintiff Athena Collins was dozing on the couch when she was startled by cracking sounds and a loud thud, later determined to be the French doors blowing out of the back room and the outside awning over the doorstep crashing down as it melted and bent from the heat.

24.     The mushroom shaped plume of black smoke emanating from the Suaoki Generator as the back room of the house burned went so high above the Residence that people from all around the neighborhood and beyond called 911.

25.     Upon seeing the plume, one off-duty firefighter traveling on the highway exited and drove to the neighborhood in response.

26.     As a result of the many people calling 911, four different fire departments responded, as did multiple police cars.

27.     The fire incinerated the Residence, the childhood home of Plaintiff Athena Collins and the home of her mother Plaintiff Evonne Saratiotis, spreading so rapidly that in less than an hour the fire fighters were already leaving the scene.

28.     At the time of the fire, the occupants of the Residence, Plaintiffs, were at home and had only minutes to escape the house.

29.     Plaintiff Athena Collins began screaming fire and yelled to her husband, Plaintiff Dan Collins, who was asleep on the first floor, to call 911, as she ran upstairs to reach her mother, Evonne Saratiotis, who was asleep in her bed one floor above and adjacent to the source of the fire below.

30.     The glass in the windows both in Evonne's bedroom and elsewhere in the house began shattering and blowing out of the frames as Plaintiff Athena Collins made her way upstairs to her mother's bedroom.

31.     Wind from the fire was swirling around as Plaintiff Athena Collins struggled to get her mother out of bed.

32.     The heat and smoke increased so fast that Plaintiff Athena Collins had to crouch to the floor with her mother in tow as she pulled her mother down a flight of stairs to the first floor.

33.      Once down the main staircase of the split-level home, Plaintiff Athena Collins still pulling her mother, rounded a corner to three more steps to the small front hallway and the front door.

34.     Just as Plaintiff Athena Collins reached the last step and began pulling her mother through the foyer toward the front door, a solid wall of black smoke reached the threshold to the hall and was moving towards them.

35.     Plaintiff Athena Collins managed to drag her mother out the front door and somehow had the presence of mind to shut it behind them, thereby preventing a backdraft that would have likely killed them even as they reached the outside.

36.     Once outside, Plaintiff Athena Collins collapsed on the ground with her mother, Evonne, on the front lawn outside the Residence.

37.     The off-duty fire fighter who had driven to the house upon seeing the smoke from the highway carried Plaintiff Evonne Saratiotis, who was wearing only a night gown and suffering from smoke inhalation and a profusely bleeding scalp laceration, to the ambulance.

38.     Plaintiff Athena Collins, shoeless, cold, and in night clothes, was covered in her mother's blood from the laceration Evonne suffered to her scalp, along with soot from the fire.

39.     Plaintiff Dan Collins had been awakened by his wife's screams to call 911 but was unable to get a signal on his mobile phone to call 911 because unbeknownst to him the breaking glass had triggered a burglar alarm call.

40.     Plaintiff Dan Collins ran outside to place the 911 call and connected with the 911 operator.

41.     Although covered in soot, Dan was not yet aware of the magnitude of the fire in the rear of the house or what was occurring inside.  Still in night clothes, shoeless, and suffering from smoke inhalation, Plaintiff Dan Collins was in shock.

42.     The fire investigation revealed the fire originated in the Suaoki Generator when its portable Li-on Power Supply malfunctioned causing all cylinders to fire off and any required failsafe to shut off the Suaoki Generator failed, creating a thermal runaway causing the unit to explode like a bomb.

43.     Every item in every corner of the Residence on every level, every drawer, every box, every closet, every cabinet, from the furthest part of the basement to the upper-level ceilings was broiled, baked, burned, blackened, and covered with soot.

44.     Over half a century of memories, souvenirs, housewares, clothing, carefully set up medical and caregiving items for Evonne were all destroyed in minutes, and, ultimately, the insurance adjuster found that absolutely nothing was salvageable due to fire, smoke, and heat – a total loss of the family Residence.

45.     Following the fire, Plaintiffs each were plagued with nightmares, sleeplessness, worry, extreme sadness and bouts of depression, so much so, they were never able to return to the Residence, selling it to a developer at a loss.

46.      The stress of having to find a way to care for Plaintiffs Dan and Tina Collins's now homeless mother/mother-in-law was extreme in and of itself, having to immediately think of how

to replace medication and other caregiving necessities for her as well as their own daily medications.

47.     Given the destruction of her home, the loss of all of her personal belongings, the medical impact, and the suffering of her own mother, who subsequently passed away, Plaintiff Athena Collins's physical and mental state following the fire made it impossible for her to return to work and continues to have a negative impact to this this day.  As a result, Plaintiff Athena Collins has incurred losses of income, livelihood, and the ability to hold a job.

48.     Upon information and belief, Amazon is a multinational technology company based in Seattle, Washington, which focuses on e-commerce, cloud computing, digital streaming, and artificial intelligence.

49.     Upon information and belief, Amazon - together with Google, Apple, Microsoft, and Facebook - is considered one of the "Big Five" companies in the United States technology industry.

50.     Upon information and belief, Amazon is widely regarded as one of the most influential economic and cultural forces in the world, in addition to being the world's most valuable brand.

51.     Upon information and belief, Amazon dominates the market as the world's largest online marketplace and retailer, a trusted household name synonymous with online shopping with well over 150 million users in the United States alone and tops the ranking of the most popular shopping web site.

52.     Upon information and belief, Amazon is the world's largest online marketplace, AI (or artificial intelligence) assistant provider, life-streaming platform and could computing platform.  Amazon is also the largest Internet company by revenue in the world, and the second largest private employer in the United States.  It is one of the world's most valuable companies.

53.     Defendant Amazon accepts credit cards and receives payment from the consumers upon the sale of products on its website.

54.     Amazon is a direct link in the chain of distribution for the sale of products.

55.     Some products sold on the Amazon website are selected by Amazon and purchased from manufacturers or distributors and then sold to consumers at a price established by Amazon. Other products are sold by third parties through Amazon's website.

56.     Third party sellers on Amazon select their own products, source them from manufacturers or distributors, set the purchase price, and use the Amazon website to reach consumers.

57.     Third party sellers pay either a monthly fee or a per item fee to Amazon for the opportunity to sell on Amazon's website.

58.     Products not sold directly by Amazon include the words "Sold by" and the name of the third-party seller instead of Amazon.

59.     At all times relevant including on March 3, 2018, Defendant Auto Living was a merchant that marketed, promoted, advertised, distributed, and sold products via Amazon through its website.

60.     Defendant Auto Living is a third-party seller on the Amazon website.

61.     To purchase a product on the Amazon web site that is offered by a third-party seller, the customer adds the product to her or his Amazon cart.

62.     At checkout, the order confirmation page on the Amazon web site again identifies the product as "Sold by" the third-party seller.

63.     To complete the purchase, Amazon charges the customer's credit card or other payment information in its files.

64.     Amazon accepts the risk that the customer's payment information will turn out to be fraudulent.

65.     After Amazon collects the payment, it deducts a referral fee and other potential fees, aggregates the remaining proceeds with those from other purchases, and remits them to the third party seller on a periodic basis.

66.      Amazon reserves the right to withhold or delay payment if it concludes the third party seller's actions or performance may result in customer disputes, chargebacks or other claims related to its Amazon sales.

67.     Amazon also requires sellers to provide bank account and credit card information that Amazon may use to obtain any amounts payable by seller to Amazon.

68.     Amazon's contractual relationship with its third party sellers is governed by its business solutions agreement ("BSA"), which Amazon requires all third party sellers to accept.

69.     Defendant Auto Living had a BSA with Amazon.

70.     The BSA states that Amazon and a third party seller are independent contractors with no agency or employment relationship.

71.     Under the BSA, a third party seller must represent that it is dully organized business existing in good standing and will comply with all applicable laws.

72.     A third party seller must indemnify Amazon for any claim related to its products sold through Amazon.

73.     If its sales are above a certain threshold, a third party seller must obtain general commercial liability insurance, listing Amazon as an additional named insured.

74.     The BSA prohibits third party sellers from offering certain products through the Amazon website, either restricting products altogether or permitting sale only with Amazon's permission.

75.     Amazon also generally prohibits sellers from listing a product at a higher price than the seller offers through other channels.

76.     If a third party seller violates Amazon's policies or applicable law, Amazon may take corrective action, including suspending the seller, destroying inventory without compensation, and permanently withholding payments.

77.     Amazon provides its customers with an "A-to-z Guarantee" for purchases made on its website, including from third party sellers.

78.     The condition of the item purchased and the timely delivery are guaranteed under the "Amazon A-to-z Guarantee."

79.     The "A-to-z Guarantee" covers defective products sold by third party sellers.

80.     If a customer encounters a problem, she or he is required to attempt to contact the third party seller through Amazon, but if the third party seller does not respond, Amazon will refund the customer the product cost, the original shipping cost, and the return shipping cost.

81.     Where the third party seller's listing is eligible for Amazon Prime, Amazon's customer service handles any issues related to the order.

82.     As part of the BSA, third party sellers may participate in the "Fulfilled by Amazon" ("FBA") program.

83.     Defendant Auto Living participated in the Amazon FBA program for the sale of the Suaoki generator.

84.     The FBA program allows third party sellers to reach customers on a global basis.

85.     Third party sellers must apply to register any product included in the FBA program.

86.     Amazon may refuse a third party seller's registration of the any product in the FBA program.

87.     The FBA program allows third party sellers with products to sell to ship their products to Amazon's warehouses to be presented for sale on the Amazon website.

88.     When a third party seller's products in the FBA program is sold, Amazon ships the product to the buyer.

89.     Amazon controls the packaging of third party sellers' products through the FBA program, which may include Amazon branding and Amazon specific messaging.

90.     To return an FBA program product, the customer ships it back to Amazon, not the third party seller.

91.     Amazon inspects the third party seller's product returned through the FBA program and if it determines the product can be resold, returns it to the third party seller's inventory at the Amazon warehouse.

92.     If Amazon determines the third party's seller's product returned through the FBA program cannot be resold, the third party seller can have it sent back to its own facilities.

93.     In the FBA program, Amazon owns the customer and Amazon rather than the company supplying the product to the FBA program controls the relationship with the buyer.

94.     The company supplying the product under the terms of the FBA program has no direct relationship with the buyer and in most cases has no indirect relationship with the buyer.

95.     The third party sellers in the FBA program have no communication with the buyer regarding the initial sale/purchase of the product.

96.     Amazon does not contact the third party seller for approval of the purchase of the product supplied to the FBA program.

97.     The third party seller in the FBA program simply discovers in a notification from Amazon that its product has been sold to the buyer.

98.     Amazon alone decides whether to allow the transaction involving the third party seller's product in the FBA program to go through.

99.     When communications between FBA suppliers and buyers or potential buyers is necessary, the communication is anonymized by Amazon through its message console on the website that sends messages through each party's e-mail address without providing the actual e-mail addresses in the communication between the parties.

100.    Amazon requires third party sellers to use only the tools and methods designated by Amazon to communication with Amazon customers.

101.    Amazon prohibits third party sellers from contacting customers to collect payments or influence their purchasing decisions.

102.    Amazon prohibits third party sellers from using Amazon customer or transaction information for any marketing or promotional purposes whatsoever.

103.    Third party sellers in the FBA program pay storage and fulfillment fees to Amazon in addition to general seller and referral fees paid by all third party sellers.

104.    Amazon assesses to third party sellers in the FBA program other fees in specific circumstances, including processing returns.

105.    At all times relevant including prior to March 3, 2018, Defendant Suaoki designed, manufactured, tested, marketed, distributed, and sold the Suaoki Model No. PSSB, 400Wh/120,000mAh220 portable solar generator lithium ion ("Li-on") power source power supply with Quiet 300W DC/AC Inverter ("the Suaoki Generator").

106.    At all times relevant including prior to March 3, 2018, the Suaoki Generator contained the Li-on power supply designed and/or manufactured by Defendants Maxtar and PowerOak ("Li-on Power Supply").

107.    At all times relevant including prior to March 3, 2018, Defendant Auto Living distributed and/or sold the Suaoki Generator, which it marketed, promoted, and advertised the Suaoki Generator for sale on the Amazon website.

108.    Defendants Amazon, Auto Living, Suaoki, Maxtar, PowerOak, and the DOEs all placed the Suaoki Generator containing the Li-on Power Supply in the stream of commerce in the State of Maryland.

109.    Defendants Amazon, Auto Living, Suaoki, Maxtar, PowerOak, and the DOEs all acted affirmatively and deliberately to avail themselves of the market of consumers in the State of Maryland.

110.    Plaintiff Daniel Collins had no contact during his purchase with Auto Living or anyone other than Amazon.

111.    Daniel Collins conducted the March 3, 2018 transaction in Maryland and Defendants Auto Living and Amazon fulfilled the order for the Suaoki Generator by processing and delivering the merchandise to Plaintiffs' Residence in Towson, Maryland.

112.    Plaintiff purchased the Suaoki Generator from Amazon based upon the promotion of the Suaoki Generator on Amazon's website, including but not limited to the Suaoki Generator's inclusion as part of Amazon's "Prime" program.

113.    Amazon's "Prime" program is a fee-based subscription service that provides Amazon users with free two-day shipping on items fulfilled by Amazon.

114.    At all times relevant including March 3, 2018, Plaintiffs subscribed to, paid for, and regularly used the Amazon Prime subscription.

115.    The purchase order that included the Suaoki Generator was 112-2892027-2620206.

116.    Amazon charged Plaintiff's credit card $379.99.

117.    No delivery fee was charged for the order which shipped from a fulfillment center in New York.

118.    Throughout the process, Plaintiff Daniel Collins had no contact with Auto Living or anyone other than Amazon.

119.    Plaintiff believed Amazon sold him the Suaoki generator.

120.    Defendants Amazon and Auto Living played a direct role in the promotion, sale, fulfillment, and distribution of the Suaoki Generator product, including the Suaoki Generator purchased by the Plaintiff that is the subject matter of this Action.

121.    At all times relevant including March 5, 2018, the Defendants caused for the Suaoki Generator to be delivered to Plaintiff Daniel Collins at the Residence.

122.    The Plaintiffs used the Suaoki Generator in the State of Maryland, as intended by the Defendants.

123.    Plaintiff Athena Collins had reviewed in advance the Suaoki Generator product preparation and use instructions, including plugging in the unit to a wall outlet to charge the generator prior to use.

124.    Defendants, individually and/or collectively, are engaged in the business of designing, manufacturing, assembling, constructing, engineering, fabricating, inspecting, producing marketing, distributing, selling and/or profiting from the sale of Suaoki Generator.

## COUNT I – STRICT LIABILITY

125.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

126.    At the time the Suaoki Generator left the control of Defendants, either individually or collectively, the Suaoki Generator was dangerous and defective as a result of design, manufacture, alteration, or modification by Defendants.  The defects included, but are not limited

to, the Li-on power supply, the thermal ruanaway resulting in the rise in heat and pressure; over-current issues in over-producing electric currents and resulting in short-circuiting the battery; and/or impurities in the electrolyte solution inside the electrolyte solution inside the battery's cells leading to overheating and explosion.

127.    At all times material, Defendants, either individually or collectively, were in the business of promoting, selling, and distributing products, including but not limited to, the Suaoki Generator that failed in Plaintiffs' Residence.

128.    Defendants expected the Suaoki Generator to, and it did, reach Plaintiffs without substantial change in the condition in which it was manufactured and/or distributed and/or sold.

129.    The Suaoki Generator combusted and caused fire damage because the Li-on Power Supply was defectively designed and/or manufactured by Defendants.

130.    The Suaoki Generator and its components, including but not limited to the Li-on Power Supply, were in a defective condition when they left the control of Defendants.

131.    The Suaoki Generator and its components, including but not limited to the Li-on Power Supply, were unreasonably dangerous to the real and personal property owned by Plaintiffs and to them personally and those persons nearby.

132.    Defendants failed to adequately warn Plaintiffs of the unreasonably dangerous condition of the Suaoki Generator.

133.    The risks inherent in the design of the Suaoki Generator outweigh any benefit of that design.

134.    The defective condition of the Suaoki Generator and its components, including but not limited to the Li-on Power Supply, was the direct and proximate cause of the fire and resulting damages, described more fully above.

135.     Defendants, individually and/or collectively, are strictly liable for the damages sustained by Plaintiffs as described herein.

136.     As a legal result of the aforementioned dangerous and defective condition of the Suaoki Generator and its components, including but not limited to the Li-on Power Supply, Plaintiffs were injured and suffered damages.

WHEREFORE, the Plaintiffs request judgment in their favor and against the Defendants, individually and/or collectively, in an amount in excess of $75,000.00, plus costs, and for such other or further relief this Court deems equitable and just.

## COUNT II – PRODUCTS LIABILITY

137.     Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

138.     At all relevant times, Defendants were engaged in the design, manufacture, testing, producing, inspecting, assembling, constructing, engineering, fabricating, marketing, distributing, selling, advertising, introducing into interstate commerce, transporting in interstate commerce, or recommending for use the Suaoki Generator to the general public so as to make it reasonably foreseeable that it would be used in the State of Maryland.

139.     Defendants owed duties of care to actual and potential customers and consumers with respect to the Suaoki Generator, including, but not limited to duties to design, manufacture, distribute, sell and provide the Suaoki Generator in a fashion that was safe to consumers; label the Suaoki Generator so as to reasonably warn consumers of the potential for danger; and reasonably apply knowledge and information from past complaints, incidents, studies, observations, reports, experience, or investigation to provide for the safety of consumers.

140.    Defendants placed the Suaoki Generator into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or manufacturing of the Suaoki Generator.

141.    The Suaoki Generator supplied to the Plaintiffs was defective in design and unreasonably dangerous when it left the hands of the Defendants, the manufacturers, suppliers, and distributors and reached the Plaintiffs without substantial alteration in the condition in which it was sold.

142.    The Suaoki Generator was unreasonably dangerous and defective beyond the extent contemplated by ordinary consumers with ordinary knowledge regarding this product.

143.    The Suaoki Generator was dangerous and defective due to the defective Li-on Power Supply which Defendants knew or should have known created a risk of fire and injury from the Suaoki Generator.

144.    The Suaoki Generator and the Li-on Power Supply were the substantial contributing cause of the injuries and losses suffered by Plaintiffs.

145.    The Suaoki Generator was being used in a foreseeable manner and for its intended purpose.

146.    As a direct and proximate cause of the aforementioned defects in the Suaoki Generator, Plaintiffs sustained damages.

WHEREFORE, the Plaintiffs request judgment in their favor and against the Defendants, individually and/or collectively, in an amount in excess of $75,000.00, plus costs, and for such other or further relief this Court deems equitable and just.

## COUNT III – FAILURE TO WARN

147.     Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

148.      The Suaoki Generator was in a dangerous and defective condition when introduced into the stream of commerce by the Defendants.  The Suaoki Generator was so defective that when used in a way that was reasonably foreseeable, the potential risks of the Suaoki Generator created a substantial danger to users and others and could and would cause serious injuries and damages.

149.     The Suaoki Generator had potential risks that were known or knowable by the use of scientific knowledge available at the time of the manufacture, design, distribution, and sale of the Suaoki Generator.

150.     Defendants knew, or in the exercise of reasonable care, should have known that the potential or inherent risks presented a substantial danger to users of the Suaoki Generator and Defendants possessed special knowledge of the materials, design, character and assembly of the Suaoki Generator.

151.     Plaintiffs and ordinary consumers would not recognize, nor have knowledge that the Suaoki Generator was dangerous and defective.

152.     Defendants, as manufacturers, promoters, recommenders, sellers, and distributors of the Suaoki Generator, had a duty to adequately warn users such as Plaintiffs of the risks set forth above inherent in the way the Suaoki Generator was marketed, and the dangers posed by the defective Li-on power supply.

153.      Defendants negligently failed to provide Plaintiffs with reasonable warnings of defects—including the defect and/or fire hazard described above—associated with the use of the Suaoki Generator, and hazards which it knew or should have known were present in the product described herein. As a result, the Suaoki Generator was rendered unreasonably dangerous and posed a

risk of harm beyond that which would be contemplated by the ordinary foreseeable user, Plaintiffs, and this was a direct and proximate cause of the fire and resultant damages to Plaintiffs as described herein.

154.    Plaintiffs were harmed and suffered injuries and damages as a result of Defendants' failure to adequately warn.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants in an amount in excess of $75,000.00, plus costs, and for such other or further relief this Court deems equitable and just.

## COUNT IV – NEGLIGENCE

155.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

156.    At all times herein, Defendants marketed, promoted, advertised, distributed, and sold the Suaoki Generator and/or its components, including the Li-on Power Supply, to the Plaintiffs.

157.    Defendants had a duty to exercise reasonable care in the marketing, promotion, advertising, recommendation, selling, and/or distribution of the Suaoki Generator and/or its components, including the Li-on Power Supply.

158.    Defendants knew the Suaoki Generator and/or its components, including the Li-on Power Supply, would be purchased by consumers such as the Plaintiffs and used without inspection for latent defects.

159.    The Suaoki Generator and/or its components, including the Li-on Power Supply, failed to perform safely as an ordinary consumer would expect when utilizing the Suaoki Generator in an intended and reasonably foreseeable manner.

160.    As marketed, promoted, advertised, distributed, and sold, the Suaoki Generator and its components, including the Li-on Power Supply, did not incorporate adequate warnings to apprise the user of the dangerous design and/or manufacturing.

161.    Defendants were negligent in the designing, manufacturing, marketing, promoting, advertising, warning, and distribution and sale of the Suaoki Generator and its components, including the Li-on Power Supply.

162.    Without such negligence, the damage alleged herein to Plaintiffs would not have occurred as such damage was the natural and probable result of Defendants' negligence.

163.    As a direct and proximate result of Defendants' negligent actions and omissions, Plaintiffs suffered damages.

WHEREFORE, the Plaintiffs request judgment in their favor and against the Defendants, individually and/or collectively, in an amount in excess of $75,000.00, plus costs, and for such other or further relief this Court deems equitable and just.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

164.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

165.    At all relevant times, Defendants marketed, manufactured, promoted, distributed, or sold the Suaoki Generator for use by the public at large, including the Plaintiffs.

166.    Defendants knew the use for which the Suaoki Generator was intended and represented or impliedly warranted the Suaoki Generator, and/or its components, including the Lio-on Power Supply to be of merchantable quality and safe and fit for its intended uses.

167.    Defendants had a duty to exercise reasonable care in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion, sale and release of the Suaoki Generator.

168.    Defendants, individually and/or collectively, further expressly and/or impliedly warranted that the Suaoki Generator and its components, including the Li-on Power Supply would be free from defects in workmanship, material, and use instruction.

169.    Plaintiffs purchased and/or made a decision to use the Suaoki Generator and reasonably relied upon the Defendants and their agents to disclose known defects, risks, and danger of the Suaoki Generator.

170.    Plaintiffs had no knowledge of the falsity or incompleteness of the Defendants' statement and representations concerning the Suaoki Generator when Plaintiffs purchased the Suaoki Generator as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Defendants.

171.    Defendants had sole access to material facts concerning the defects, and Defendants knew that users, such as Plaintiffs, could not have reasonably discovered such defects.

172.    Defendants impliedly warranted to Plaintiffs that the Suaoki Generator and its components, including but not limited to the Li-on Power Supply, was merchantable and fit for the purpose intended.

173.    Defendants breached this warranty in designing, manufacturing, selling, and distributing the Suaoki Generator in a dangerous and defective condition and in failing to warn Plaintiffs and purchasers of the Suaoki Generator of these defects.

174.    Said breaches of warranties were a direct and proximate cause of the fire and resulting damages to Plaintiffs.

WHEREFORE, the Plaintiffs request judgment in their favor and against the Defendants, individually and/or collectively, in an amount in excess of $75,000.00, plus costs, and for such other or further relief this Court deems equitable and just.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF FITNESS
## FOR A SPECIFIC PURPOSE

175.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

176.    Defendants, individually and/or collectively, expressly and/or impliedly warranted the fitness for a specific purpose of the Suaoki Generator.

177.    Defendants, individually and/or collectively, further expressly and/or impliedly warranted that the Suaoki Generator and its components, including the Li-on Power Supply, would be free from defects in workmanship, material, and use instruction.

178.    Defendants, individually and/or collectively, knew or should have known that Plaintiffs as consumers rely on Defendants' skill and judgment when choosing the Suaoki Generator to accomplish that purpose.

179.    The Suaoki Generator was neither appropriate nor safe for the specific purpose intended.

180.    Defendants, individually and/or collectively, breached the aforementioned implied warranty of fitness by selling and distributing the Suaoki Generator, and said breaches of warranties were a direct and proximate cause of the fire and resulting damages to Plaintiffs.

WHEREFORE, the Plaintiffs request judgment in their favor and against the Defendants, individually and/or collectively, in an amount in excess of $75,000.00, plus costs, and for such other or further relief this Court deems equitable and just.

## COUNT VII
## <u>SURVIVAL ACTION</u>

181.    Plaintiffs adopt and reallege the allegations contained in paragraphs 1 through 124 as if fully set forth herein.

182.    On March 11, 2018, Evonne Saratiotis sustained severe bodily injuries which subsequently caused her death as a result of the unreasonably dangerous Suaoki Generator when its portable Li-on Power Supply failed causing the unit to explode like a bomb leading to the fire that destroyed the Residence.

183.    The Suaoki Generator was defective, containing a defective Li-on Power Supply, a latent defect rendering the product unreasonably dangerous.

184.    As a result of the defective Suaoki Generator, Evonne Saratiotis barely escaped with her life, lost her home that had been set up to accommodate her medical and care giving needs, and forced her into a nursing home where she died from her injuries four (4) months later.

185.    Defendants owed Evonne Saratiotis a duty of reasonable care to design, manufacture, and distribute a safe product free from defect and/or fire hazard for use that would be contemplated by the ordinary foreseeable user.

186.    Defendants failed in this duty as the Suaoki Generator was defective, contain a defective Li-on Power Supply, a latent defect rendering the generator unreasonably dangerous, thereby causing the injuries sustained by Evonne Saratiotis and her subsequent death.

187.    Although severely injured in the fire, Evonne Saratiotis was conscious and alive after the fire, surviving until the time of her death four months later on July 14, 2018.

188.    As a direct and proximate result of Defendants' negligent actions and omissions, Evonne Saratiotis sustained severe conscious pain and suffering between the time of the fire and the time of her death.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants in an amount in excess of $75,000.00, plus costs, and for such other or further relief this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on any issue triable of right by a jury in this matter.

Dated: 3/9/2021                                **BOWIE & JENSEN, LLC**

By      /s/ Matthew G. Hjortsberg
Matthew G. Hjortsberg (Bar No. 024949)
Jason C. Brino (Bar No. 023535)
Gina M. Harasti (Bar No. 09680)
210 W. Pennsylvania Ave., Ste. 400
Towson, MD  21204
Telephone: (410) 583-2400
Facsimile:  (410) 583-2437
hjortsberg@bowie-jensen.com
brino@bowie-jensen.com
harasti@bowie-jensen.com
*Attorneys for Plaintiffs*